UNITED STATES of America, Plaintiff,

v.

Robert W. PORCO, Christopher P. Cusumano, and Thomas J. Santanello, Defendants.

No. 93–CR–0102–B.

United States District Court, D. Wyoming.

Jan. 27, 1994.

William U. Hill, Asst. U.S. Atty., Cheyenne, WY, for U.S.

Donald Horowitz, Hackensack, NJ, and James W. Gusea, Cheyenne, WY, for Robert W. Porco.

Daniel G. Blythe, John B. Rogers, Cheyenne, WY, for Christopher P. Cusumano.

Michael R. O'Donnell, Asst. Fed. Pub. Defender, Cheyenne, WY, for Thomas J. Santanello.

## ORDER DENYING MOTIONS

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon Defendants Porco and Cusumano's motions to suppress evidence, Defendant Cusumano's motion to suppress statements, Defendant Cusumano's motion for a *James* hearing, Defendants Porco and Cusumano's motions for preservation of evidence, Defendants Porco and Cusumano's motions for discovery, and Defendant Porco's Motion to Sever, and the parties' briefs in support of and in opposition thereto, and the Court having reviewed the materials on file herein, having heard argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

## BACKGROUND

The defendants in this case were charged with the conspiracy to manufacture marijuana by cultivation, in violation of 21 U.S.C. § 846, the manufacture of marijuana, in violation of 21 U.S.C. § 841(a)(1), and with aiding and abetting in the manufacture of marijuana, in violation of 18 U.S.C. § 2. Defendants Porco and Cusumano have made numerous motions, including motions to suppress evidence and statements, motions for a *James* hearing, motions for the preservation of evidence, motions for discovery, and a motion to sever. The Court addresses each motion below.[1]

### I. Defendants Porco and Cusumano's Motions to Suppress Evidence

The defendants have filed a motion to exclude from evidence all items obtained by the Laramie County Sheriff's department pursuant to a search warrant issued on August 26, 1993, which authorized a search of their residence at 3679 Piper Lane, Cheyenne, Wyoming. There are four grounds upon which this motion is based: (1) the Laramie County Sheriff's department conducted a warrantless predicate search in violation of the Fourth Amendment when it used a thermal imaging device on the defendants' residence; (2) the Laramie County Sheriff's department's search of the defendants' electrical usage was an unjustified warrantless search; (3) the search warrant and its execution were defective; and (4) the affidavit underlying the search warrant lacked probable cause.

### A. The Thermal Imaging Device

#### 1. Factual Background

The first argument made by the defendants concerns a thermal imaging device which was used to detect heat loss emanating from their residence. The defendants contend that the use of the device constituted a

---

1. At the hearing on these motions, defendant Porco withdrew his motion for an intra-district transfer. Accordingly, the Court need not consider this motion.

warrantless search and thus, violated their Fourth Amendment rights.

During the course of their investigation, Special Agents Mike Curran and Al Bennett of the Wyoming Division of Criminal Investigation used a thermal imager to detect inordinate heat loss from the defendants' residence that was consistent with an indoor marijuana grow operation.

The thermal imaging device does not detect or enhance visible light, but rather, operates in the thermal infrared spectrum to detect differences in temperature of the surface of objects being viewed. It is a passive, non-intrusive system which does not penetrate or send any rays or beams into the area which is being viewed. The device is a hand held unit which looks like a 35 mm camera. Its range, according to Curran, is from between 2 feet to one quarter of a mile. The device, which operates best three to four hours after sunset, records the relative temperatures of objects being viewed. Objects examined by the device will appear to be white if they have a relatively high temperature, while cooler objects will appear as grey or black. The reading taken by the imager can be viewed through a viewfinder and is recorded on a videotape. Similar devices have been used for a variety of purposes including the identification of inefficient building insulation and the detection of forest fire lines through smoke.

Both Agents Curran and Bennett have received formalized training in the theory and operating of the thermal imager from the Drug Enforcement Agency and Agent Curran had used the device approximately 42 time prior to its use in the investigation of this case.

On the evening of July 2, 1993, Curran and Bennett drove to the area of 3679 Piper Lane to view the residence with the thermal imager. They first took a reading of the back side of the residence from Piper Lane. They then drove around the South side of the house to an airstrip of a nearby airfield where they were able to view the front of the house. The agents never left their vehicle or entered onto the property of 3679 Piper Lane. The reading of the back side of the house did not reveal a very detailed image,

however, the reading of the front side of the house showed several hot spots emanating from the front door and the roof of the residence. This reading indicated an inordinate amount of heat loss which would be consistent with a marijuana grow operation using high intensity grow lights which produce a significant amount of heat.

## 2. Discussion

The Fourth Amendment to the United States Constitution provides, in pertinent part that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause
>
> . . .

Accordingly, this Court must first determine whether the use of the thermal imaging device in this case constituted a search within the meaning of the Fourth Amendment. If the Court concludes that use of the device constituted a search, then it must go on to consider the legality of the search.

In the case of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court articulated the test for determining the existence of an interest protected by the Fourth Amendment. The *Katz* Court held that "the capacity to invoke the protection of the Fourth Amendment depends ... on whether the person seeking the protection of the Amendment had a legitimate expectation of privacy in the invaded place." *United States v. Penny–Feeney*, 773 F.Supp. 220, 225 (D.Hawaii 1991) (citing *Katz*, 389 U.S. at 353, 88 S.Ct. at 512 (Harlan, J., concurring)). A legitimate expectation of privacy is said to exist where (1) the individual involved has an actual, subjective expectation of privacy; and (2) the expectation is one that society is willing to recognize as reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

The Court finds instructive the case of *United States v. Penny–Feeney*, which is very similar on its facts to the case at bar. In that case, an infrared thermal imaging device was used from an airplane which flew over the defendants' residence. *Penny–Fee-*

*ney,* 773 F.Supp. at 223. The court in that case characterized the heat emanating from the home as waste and concluded that the defendants "did not manifest an actual expectation of privacy in the heat waste since they voluntarily vented it outside the garage where it could be exposed to the public and in no way attempted to impede its escape or exercise dominion over it." *Id.* at 226.

■ The government contends that the defendants in this case similarly did not have a subjective expectation of privacy in the heat generated from their home. The defendants argue, however, that the fact that they covered their basement windows with cardboard and leaned a camper shell over an open garage window indicates that they did have an expectation of privacy. Upon examination of this argument, it seems that, from their actions, the defendants may have had an expectation of privacy in the view of the interior of the residence, but it remains questionable whether they had any such expectation in the heat which was escaping from the building. Moreover, the defendants did nothing to prevent heat from escaping.

However, even if the defendants were able to demonstrate that they had an expectation of privacy in the heat emanating from their residence, they have not established that society would be willing to accept such an expectation as objectively reasonable. The *Penny–Feeney* court analogized the heat detected by a thermal imaging device to garbage placed outside of a person's home which was addressed in the case of *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1987). The court stated:

> Both cases involve a homeowner's disposing of waste matter in areas exposed to the public. In *Greenwood,* the exposure was visual and the Court found that it was in no way diminished by the fact that the garbage was stored in opaque trash bags. Here, the exposure is heat-sensory and is in no way diminished by the fact that the source of the heat could only be detected by use of the [thermal imaging device].

*Penny–Feeney,* 773 F.Supp. at 226. The fact that in this case the defendants did nothing to either conceal the heat emanating from their residence, nor did they vent it from their residence, as the *Penny–Feeney* defendants did, is not determinative of whether society would consider an expectation of privacy in the heat a reasonable one. Indeed, the Supreme Court has repeatedly held that the use of non-intrusive, extra-sensory devices to investigate people and objects does not constitute a search protected by the Fourth Amendment. For example, the Court has held that using a beeper to track the movements of a vehicle is not considered a search, *see United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), using a dog to sniff luggage at an airport for drugs is not a search, *see United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and establishing a pen register with the phone company to ascertain the phone numbers called by a private residence is not a search, *see Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

It is significant that the agents did not enter onto the curtilage of the property when they used the thermal imager. In *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the defendant's backyard was shielded from view at ground level by two fences. Police officers secured a private plane, flew over the defendant's house and identified marijuana plants growing in the yard. The Supreme Court held that the aerial inspection did not amount to a search protected by the Fourth Amendment, stressing the fact that the observation was within navigable airspace and that the observation was physically non-intrusive. *Id.* at 213, 106 S.Ct. at 1812. In *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), the Supreme Court stated that "the home and its curtilage are not necessarily protected from inspection that involved no physical invasion" and that, "[a]s a general proposition, the police may see what may be seen 'from a public vantage point where [they have] a right to be.'" (citation omitted). *See also United States v. Broussard,* 987 F.2d 215, 222 (5th Cir.1993) (holding that evidence from thermal imaging device supported finding of probable cause to issue search warrant of defendant's trailer).

In this case the agents were on a public road, using a nonintrusive device to view the heat loss emanating from the defendants' residence. Moreover, the agents never entered the curtilage of the property, nor did they cause rays, beams, dust particles or any other object to invade the property. Therefore, the Court concludes that the use of the thermal imaging device did not constitute a search that was protected by the Fourth Amendment.

## B. The Defendants' Electrical Usage

During the course of the investigation, Laramie County Deputy Sheriff Bohlig contacted the Rural Electric Association to obtain electrical usage statistics for the residence at 3679 Piper Lane. The defendants contend that this constituted an unjustified warrantless search. As explained above, the Fourth Amendment does not protect a person from a search unless they have (1) an actual, subjective expectation of privacy; and (2) the expectation is one that society is willing to recognize as reasonable. *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

■ The defendants argue that they had an expectation of privacy in the records of their electrical usage kept by Rural Electric because Rural Electric would not voluntarily disclose a person's electric usage. This Court concludes, however, that even if the defendants had a subjective expectation of privacy in their electrical usage, this expectation is not one that society would recognize as reasonable or legitimate and is therefore not protected by the Fourth Amendment. The Supreme Court has repeatedly held that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by the third party to government authorities, even if the information is revealed to the third party confidentially and on the assumption that it will be used only for limited purposes. *See, e.g., United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (bank customer has no legitimate expectation of privacy in loan guarantee agreement stolen by government agents from briefcase of bank official); *Smith v. Maryland,* 442 U.S. 735,

740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (telephone user has no legitimate expectation of privacy in the numbers he dials on his telephone); *United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976) (bank depositor has no legitimate expectation of privacy in copies of checks and deposit slips retained by his bank); *Donaldson v. United States,* 400 U.S. 517, 522, 91 S.Ct. 534, 538, 27 L.Ed.2d 580 (1971) (employee has no Fourth Amendment interest in the employment records of his employer); *Fitzgerald v. State,* 599 P.2d 572, 579 (Wyo.1979) (holding that person had no reasonable expectation of privacy in bank records containing information voluntarily given to the bank).

The defendants attempt to circumvent this rule, claiming that they never voluntarily disclosed any information to Rural Electric. This argument, however, is unpersuasive. As one court has stated, "[n]o person has a legitimate expectation of privacy in the business-records of an entity with whom business has been conducted and, therefore, has no interest protected by the Fourth Amendment in such records." *United States v. Simmons,* 569 F.Supp. 1155, 1157 (M.D.Tenn.1983) (holding that there was no legitimate expectation of privacy in records maintained regarding purchase of international identification card). The defendants chose to use electricity provided by Rural Electric and knew that their electrical usage was monitored by Rural Electric in order to generate a monthly bill. Therefore, the defendants had no legitimate expectation of privacy in Rural Electric records of the electrical usage at their residence. Accordingly, Deputy Sheriff Bohlig's investigation of these records did not constitute a search protected by the Fourth Amendment.

## C. The Search Warrant and its Execution

On August 26, 1993, at approximately 7:30 p.m., the Laramie County Sheriff's department executed a search warrant on the premises of 3679 Piper Lane. The defendants argue that the search warrant and its execution were defective. The search warrant in this case directed that it be executed

during the "daytime." The defendants contend that because the warrant in this case was executed at approximately 7:30 p.m., and because sunset occurred at 6:43 p.m. according to the National Weather Service, the execution of the warrant did not take place during the "daytime" as commanded by the warrant and was therefore defective.

█ Rule 41(c) of the Wyoming Rules of Criminal Procedure provides that a

> warrant shall direct that it be served between 6 a.m. and 10 p.m., unless the issuing authority, by appropriate provision in the warrant, and reasonable cause shown, authorizes its execution at other times.

This statutory language is virtually identical to the federal provision embodied in Rule 41(c) of the Federal Rules of Criminal Procedure. Federal Rule 41(c) further defines the term "daytime" to mean the hours from 6:00 a.m. to 10:00 p.m., according to local time. In *United States v. Keene*, 915 F.2d 1164, 1168 (8th Cir.1990), the Eighth Circuit Court of Appeals held that a search which was conducted at 8:20 p.m. was a daytime search under Rule 41 even though the search occurred after sunset. This Court can think of no reason to interpret the meaning of "daytime" as commanded in the warrant to mean anything other than the definition given under the federal rules, particularly when the Wyoming Rule specifies the identical time frame as referred to by the federal definition of "daytime". Therefore, this Court concludes, as did the court in *Keene*, that the search, which occurred at about 7:30 p.m., occurred during the "daytime" as required by the Wyoming and United States rules of criminal procedure. Accordingly, the execution of the warrant was not defective.

Moreover, no additional probable cause would have been necessary to justify a night-

time search in this case. In *Mason v. United States*, 719 F.2d 1485 (10th Cir.1983), a Wyoming judge had approved the serving of a warrant at any time and the police conducted their search at 7:30 p.m. Analyzing Rule 41(c), Wyoming Statute § 35–7–1045(d) and the identical federal provision, 21 U.S.C. § 879(a)[2], the court held that because the Wyoming Courts have not interpreted the Wyoming statute differently than the United States has interpreted its identical rules, the search did not violate Wyoming law.[3] *Id.* at 1488–89.

### D. The affidavit Underlying the Search Warrant

The affidavit upon which the Judge relied when he issued the warrant in this case was provided by Detective Bohlig. The defendants argue that, with or without the electrical usage records and the information obtained by the use of the thermal imaging device, this affidavit lacked probable cause to justify the issuance of the warrant. This Court disagrees.

█ Probable cause for a search is established when there are reasonable grounds to believe that objects connected to criminal activity or otherwise subject to seizure are presently located in the particular place to be searched. *See Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). In determining whether probable cause exists,

> [t]he task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty

**2.** 21 U.S.C. § 879(a) and Wyo.Stat. § 35–7–1045(d) provide that a
> search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge ... issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.

**3.** In *Gooding v. United States*, 416 U.S. 430, 458, 94 S.Ct. 1780, 1794, 40 L.Ed.2d 250 (1974) the

Supreme Court held that no special showing is required for a nighttime search under § 879(a) and that it is adequate to have a showing that the contraband is likely to be on the property or person to be searched at that time. The *Mason* court concluded that this construction of the statutory scheme applied to the Wyoming statute as well and therefore there was sufficient probable cause to justify the search in that case.

of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

■ A reading of the affidavit in this case reveals that the Judge who issued the warrant had a substantial basis for concluding that probable cause existed. The affidavit supporting the warrant in this case contains a number of corroborating facts. For example, the affiant stated that he has determined that the defendants paid their rent in cash, that he could not locate any place of employment for the defendants, that the electricity usage for the premises had been unusually high since April of 1993, which would tend to indicate the existence of a marijuana grow operation, and that a generator was being used throughout the day and night at the premises. The affiant also described the results of the thermal imaging performed by Agents Curran and Bennett which indicated a significantly higher heat loss than buildings nearby. The affidavit describes information provided by Dick Wagner, an electrician, who examined the electrical wiring in the basement of the home. The affiant stated that the defendants told Wagner that certain wiring modifications were made for the construction of a sound stage. He stated that Wagner was asked to approve modifications made to the wiring by the defendants. Wagner refused to do so because of the unsafe wiring and also because he suspected that the 'sound stage' was in fact not a sound stage but intended for an unlawful purpose. The affidavit also describes other events which occurred at the residence when the landlady, Mrs. Podrabinsky visited the house. For example, she noticed the new electrical wiring in the basement, she noticed a "musty odor that took her breath away" in the basement, and when she asked about the fluorescent light in the basement the defendants told her that they used it to grow fresh vegetables. The affidavit relays information obtained from Mr. Dawson, an insurance agent who had stopped by the premises and noticed wheel barrels and large soil sacks which were placed near the patio doors leading toward the basement. Affiant Bohlig explained that Mr. Dawson, describing his encounter with a white male who was at the house, stated that the man acted very suspicious and that he felt he was in danger. With so much evidence presented to the Judge, this Court would be loathe to hold that he made a mistake in concluding that, under the totality of the circumstances, the affidavit establishes probable cause.

■ Moreover, any defects in the search warrant itself do not merit the application of the exclusionary rule. Under the good faith exception to the exclusionary rule, evidence obtained by law enforcement agents acting in objectively reasonable good faith reliance upon a search warrant is admissible. *United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984). However, there are four circumstances under which the good faith exception will not apply: first, when the magistrate who issued the warrant was misled by information in the affidavit which the affiant knew or should have known was false; second, when the magistrate has wholly abandoned his judicial role; third, when the affidavit is so lacking in probable cause as to render official belief in the existence of probable cause entirely unreasonable; and finally, when the warrant is facially deficient. *Id.* at 923, 104 S.Ct. at 3420.

None of these circumstances exist in this case. First, the statements contained in the affidavit reflect an accurate chronology of the investigation and are not misleading. Second, the defendants do not allege that the Judge who issued the warrant in this case wholly abandoned his judicial role. Furthermore, there does not appear to be any basis for such an allegation. Third, as discussed above, the affidavit gives an extensive list of factors, which taken together, give sufficient indicia of probable cause. Finally, there is no facial deficiency in the warrant. It states, with particularity, the place to be searched, 3679 Piper Lane, and the items which the affiant expected to seize there.

In sum, this Court has concluded that the Laramie County Sheriff's Department's use of a thermal imaging device to detect heat emanating from the defendants' residence and its inquiry into the defendants' electrical

usage did not constitute searches protected by the Fourth Amendment; the search warrant's execution was valid; and the affidavit underlying the search warrant provided the magistrate a substantial basis for concluding that probable cause existed. Accordingly, the evidence obtained by the Laramie County Sheriff's Department in its investigation and subsequent search of the residence at 3679 Piper Lane should not be suppressed. The defendants' motion to suppress evidence will, therefore, be denied.

## II. Defendant Cusumano's Motion to Suppress Statements

When the law enforcement officers executed the search warrant on August 23, 1993, at 3679 Piper Lane, defendant Cusumano met them at the front door. He was detained and handcuffed while the search proceeded. After assisting in the initial entry and search of the residence, Special Agent Pat Barrett ("Barrett") took Cusumano to the kitchen and removed his handcuffs. Cusumano made a number of statements to Barrett before any questions were asked of him. These statements mostly consisted of inquiries about what would happen next and the type of penalties to which he might be subject. He asked, "How stupid were we?" and whether it was a Federal tip that got them caught.

Before Barrett asked Cusumano any questions, he advised Cusumano of his rights as mandated by *Miranda*. He informed Cusumano that he was going to ask only background questions. Initially, Cusumano did not request an attorney and made several incriminating statements, including a response to Barrett's question of how long he had been in the area of "How long does it take to grow that much dope?" and a statement indicating that he was a grower, not a transporter. Some time later, Cusumano stated that he did not want to answer any more questions until consulting an attorney. Barrett, who had asked only background and biographical questions up until this point, ceased all questioning.

Cusumano has filed a motion to suppress the statements he made to Special Agent Barrett. In support of this motion, Cusumano argues that these statements were not voluntarily made. He also contends that he was not fully aware of the nature of the charges, that he was not adequately advised of his right to refuse to make a statement or of his right to counsel, and that the statements were the result of a custodial interrogation, in violation of the Fifth and Sixth Amendments to the United States Constitution.

In this case the several of the statements at issue are those made by Cusumano after he was informed of his rights per *Miranda*. For a suspect to waive his *Miranda* rights, two requirements must be met:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Hernandez*, 913 F.2d 1506, 1509 (10th Cir.1990). However, a "suspect need not ... understand the tactical advantage of remaining silent in order to effectuate a valid waiver." *Id.* Statements are considered to be involuntary if, under the totality of circumstances, a defendant's will was overborne by physical or psychological pressure, *see Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969), and there is an element of police coercion. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Here there was no coercion on the part of the officers questioning defendant Cusumano. He was interrogated in his own home, his *Miranda* rights were explained to him, he indicated that he understood these rights, and he was not subjected to any physical or psychological pressure. The circumstances also indicate that Cusumano chose to speak with Barrett with full awareness of his right not to do so. Cusumano heard his *Miranda* rights, made several statements which were not even in response to questions asked by Barrett, and then later invoked his right to counsel at which point all questioning ceased. The Court concludes that the statements made

prior to the time that Cusumano invoked his right to counsel were voluntary.

 In addition, the Court concludes that the statements made prior to the time when Barrett informed Cusumano of his *Miranda* rights were made voluntarily. *Miranda* rights are not required if the suspect is not being interrogated, because he is not being compelled to anything in any constitutionally significant sense. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). Interrogation is "either express questioning or its functional equivalent ... words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The statements made before Barrett took defendant Cusumano to the kitchen, informed him of his *Miranda* rights, and began asking him background questions, were not the result of interrogation. Rather, these statements were made voluntarily, and not in response to any questions or actions on the part of the officers.

 Finally, with respect to the defendant's argument that the statements were taken in violation of the Fifth and Sixth Amendments, the government points out that the Sixth Amendment right to counsel does not attach until after the initiation of formal charges. *United States v. Mitcheltree*, 940 F.2d 1329, 1339 (10th Cir.1991) (citing *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). In this instance, defendant Cusumano had not been formally charged at the time he made the incriminating statements and, therefore, the defendant's argument must fail.

For these reasons, the Court will deny defendant Cusumano's motion to suppress statements.

### III. Defendant Cusumano's Motion for a *James* Hearing

Defendant Cusumano has made a motion pursuant to *United States v. James*, 590 F.2d 575 (5th Cir.1979) and *United States v. Petersen*, 611 F.2d 1313, 1327 (10th Cir.1979), requesting a hearing to determine the admissibility of any statements made by alleged co-conspirators and to determine whether a conspiracy existed. This Court holds that a *James* hearing would be unnecessary at this point because the government does not intend to introduce any testimony that would be the proper subject of a *James* hearing, as defined by Rule 801(d)(2)(E) of the Federal Rules of Evidence. Accordingly, the defendant's motion must be denied.

### IV. Defendants Porco and Cusumano's Motions for Preservation of Evidence

Defendants Porco and Cusumano have made motions requesting the Court to require the government to preserve all evidence that it has compiled in the case, including notes taken during the course of the investigation, audio or video tapes, and any other relevant evidence. In particular, they request that the plants which were seized not be destroyed, modified, or altered in any way which would make counting them difficult of subject to question.

The United States contends that the Federal Rules of Criminal Procedure do not require the preservation of notes. Witness' statements, however, are required to be preserved under the Jencks Act, 18 U.S.C. § 3500(c). The Tenth Circuit has held that the government is not required to produce an agent's "informal" or handwritten description of the testimony of witnesses. *United States v. Smaldone*, 544 F.2d 456, 461 (10th Cir. 1976), *cert. denied*, 430 U.S. 967, 97 S.Ct. 1648, 52 L.Ed.2d 358 (1977).

 The United States also contends that it is not in possession of any "rough notes" of various agencies that participated in the investigation. The Court recognizes that the United States is under no obligation to preserve investigative materials used in the case. As to other evidence, such as audio or video tapes, the United States is unaware of any ongoing process of destruction. Such a process would, in fact, hinder the ongoing investigation of the case. With respect to the marijuana plants, the United States assures that it has not and will not destroy or modify them in any way that would make

counting the plants difficult or subject to question. Given these assurances regarding the marijuana plants and audio or videotapes, the Court denies the defendants' motions for the preservation of evidence.

## V. Defendants Porco and Cusumano's Motions for Discovery

Finally, defendants Porco and Cusumano have made motions for discovery. The Court notes, however, that it has already ordered discovery to the full extent allowed by Rule 16 of the Federal Rules of Criminal Procedure at the time of the defendants' arraignment. Therefore, any additional motions for discovery are unnecessary. As a result, this motion will also be denied.

## VI. Defendant Porco's Motion to Sever

Defendant Porco made a motion to sever in response to this Court's denial of defendant Cusumano's motion to suppress statements at the hearing. Defendant Porco contends that the admission of Cusumano's statement, "How stupid were we?," his question whether it was a federal tip that got them caught, and his statement claiming that he was the grower, would prejudice Porco and that neither cross-examination, nor limiting instructions would dispel this prejudice. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). At the oral argument regarding this motion, the United States conceded that it would stipulate to the exclusion of the statement: "How stupid were we?" and the question of whether it was a federal tip that got them caught.

■ Therefore, the only statement that the Court must address is the statement that defendant Cusumano made which indicated that he was the grower. This statement is distinguishable from the statement made in *Bruton.* In *Bruton,* the co-defendant's statement specifically implicated defendant Bruton. Here the statement made by Cusumano was not specific and does not implicate anyone but himself. This statement is an admission of his own guilt but does not implicate the other defendants. Therefore, there is no prejudice to defendant Porco. Accordingly, defendant Porco's motion to sever will be denied.

**THEREFORE,** It is

**ORDERED** that the defendants Porco and Cusumano's Motions to Suppress Evidence be, and the same hereby are, **DENIED.** It is further

**ORDERED** that defendant Cusumano's Motion to Suppress Statements be, and the same hereby is, **DENIED.** It is further

**ORDERED** that defendant Cusumano's Motion for a *James* hearing be, and the same hereby is, **DENIED.** It is further

**ORDERED** that defendants Porco and Cusumano's Motions for Preservation of Evidence be, and the same hereby are, **DENIED.** It is further

**ORDERED** that defendants Porco and Cusumano's Motions for Discovery be, and the same hereby are, **DENIED.** It is further

**ORDERED** that defendant Porco's Motion to Sever be, and the same hereby is, **DENIED.**