69 F.3d 548
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Petrolino RAMOS, Petitioner-Appellant,
v.
Duane SHILLINGER, Warden of the Wyoming State Penitentiary;
and the Attorney General of the State of Wyoming,
Respondents-Appellees.
 No. 95-8013.
 United States Court of Appeals, Tenth Circuit.
 Oct. 23, 1995.
 
 Before ANDERSON, BALDOCK and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT*
 BRORBY, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Petrolino Ramos, a state prisoner proceeding pro se and in forma pauperis, appeals the denial of his petition for a writ of habeas corpus. We affirm.
 
 
 3
 A Wyoming state jury convicted Mr. Ramos of second-degree murder. The basic facts underlying the conviction are set forth in Mr. Ramos' direct appeal to the Supreme Court of Wyoming and we do not repeat them in detail here. See Ramos v. State, 806 P.2d 822 (Wyo.1991). Suffice it to say that several people were gathered at Mr. Ramos' residence and Mr. Ramos and the victim got into an argument about what music should be played on the stereo. The argument ended when Mr. Ramos stabbed the victim several times, including a fatal wound to the heart. Mr. Ramos raised eight issues in his direct appeal. The Supreme Court of Wyoming rejected his contentions and affirmed. Mr. Ramos did not seek other postconviction relief in state court.
 
 
 4
 Mr. Ramos subsequently filed a habeas corpus petition in federal court. The United States District Court dismissed five of Mr. Ramos' eight claims without prejudice because he had not exhausted the remedies available under state law. In the same order, the district court directed the state to show cause why relief should not be granted on Mr. Ramos' three remaining claims in which he alleged: (1) the state court admitted a confession obtained in violation of Miranda v. Arizona, 440 U.S. 934 (1966); (2) the state court erroneously refused to hold a hearing on the voluntariness of that confession; and (3) the state trial court erroneously refused to give Mr. Ramos' requested jury instruction on self-defense.
 
 
 5
 The district court later rejected the exhausted claims and denied Mr. Ramos' petition on the merits. The gist of the district court's ruling was that constitutional error existed concerning two of Mr. Ramos' claims, but the error was harmless.
 
 
 6
 Mr. Ramos now contends the district court erred in finding he had not exhausted his state court remedies for five of his eight federal claims. However, Mr. Ramos does not tell us the basis of his argument. Rather he merely asserts he exhausted his claims. This he has not done. Mere conclusions are not sufficient. In addition, our review of the record shows the district court was correct to conclude that Mr. Ramos' claims were not exhausted because (1) he did not assert claim "G" in his direct appeal and (2) he did not "fairly present" claims C, D, E, and F as violations of federal rather than state law in his direct appeal.
 
 
 7
 Mr. Ramos also contends the district court erred by rejecting his remaining claims on the merits. We disagree. After reviewing de novo the district court's decision, which we have attached to this Order and Judgment, we conclude that its analysis and conclusion was correct.
 
 
 8
 The judgment of the district court is AFFIRMED for substantially the same reasons set forth therein. The mandate shall issue forthwith.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF WYOMING
 
 9
 Petrolino Ramos, Petitioner,
 
 
 10
 v.
 
 
 11
 Duane Shillinger, Warden of the Wyoming State Penitentiary,
 
 
 12
 and the Attorney General of the State of Wyoming,
 
 
 13
 Respondents.
 
 No. 92-CV-0195-B
 
 14
 ORDER GRANTING THE RESPONDENT'S MOTION TO DISMISS
 
 
 15
 PETITIONER'S PETITION FOR A WRIT OF HABEAS CORPUS
 
 
 16
 BRIMMER, District Judge.
 
 
 17
 The above-entitled matter having come before the Court on the petitioner's Petition for a Writ of Habeas Corpus and the respondents' Motion to Dismiss, and the Court, having reviewed the materials on file herein both in support of and in opposition to, and being fully advised in the premises, FINDS and ORDERS as follows:
 
 Factual Background
 
 18
 On May 4, 1989, a jury convicted Petitioner Petrolino Ramos of second degree murder after a trial in the District Court of Natrona County, Wyoming. The relevant facts surrounding the crime are discussed below, but a full account may be found in the Wyoming Supreme Court's rejection of the petitioner's direct appeal. Ramos v. State, 806 P.2d 822 (Wyo.1991).
 
 
 19
 On January 28, 1989 the petitioner hosted a gathering of friends and acquaintances at his home in Casper, Wyoming to listen to music, play pool, and drink alcohol. Later in the evening, an argument occurred over what kind of music should be played on the stereo. This disturbance resulted in an altercation between the petitioner and Mr. Martine Olivo. After the petitioner exchanged words with Mr. Olivo, Mr. Olivo began to leave with three friends. Petitioner escaped from the grasp of individuals who were holding him back, followed Mr. Olivo outside, discarded his jacket and approached Mr. Olivo. During a brief struggle, the petitioner stabbed Mr. Olivo once in the arm and twice in the chest. Petitioner then fled the scene with two friends and was caught by the police the next day. Mr. Olivo died from a stab wound to the heart.
 
 
 20
 Petitioner was charged with aggravated assault and battery and first degree murder. At his trial, the court granted the petitioner's motion for a judgment of acquittal on the aggravated assault and battery charge as well as the first degree murder charge. The jury found the petitioner guilty of second-degree murder and he was sentenced to a term of not less than thirty-five years nor more than forty years in the Wyoming State Penitentiary.
 
 
 21
 Petition appealed his conviction to the Wyoming Supreme Court on eight separate grounds. A majority of the court rejected the petitioner's claims and affirmed his conviction. See Ramos v. State, supra. On September 2, 1992, the petitioner filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. Sec. 2254. In his original petition, the petitioner raised essentially the same claims rejected by the Wyoming Supreme Court.
 
 
 22
 On April 26, 1994, this Court issued an order noting that the petition was "mixed" with unexhausted and exhausted claims, in violation of the "total exhaustion" requirement of Rose v. Lundy, 455 U.S. 509, 520-522 (1982). That order rejected the respondents' request to dismiss the petition, and allowed the petitioner the option of dismissing his petition, obtaining total exhaustion and refiling or having the Court consider only the exhausted claims. After receiving an extension of time to respond, the petitioner opted to have the Court consider the exhausted claims. Those claims are:
 
 
 23
 (1) The admission of a confession made by the petitioner after he invoked his right to counsel under Miranda;
 
 
 24
 (2) The state trial court's refusal to hold a pretrial hearing on the admissibility/voluntariness of that confession in violation of the petitioner's due process rights; and
 
 
 25
 (3) The trial court's refusal to give the petitioner's requested instructions on self-defense in violation of his right to due process.
 
 
 26
 It is these claims that the Court now considers.
 
 Discussion
 
 27
 I. Admission of a Confession made by the Petitioner after Invoking his Miranda right to Counsel.
 
 
 28
 According to the testimony at trial, the petitioner was in custody and had been informed of his rights when officers from the Casper police department questioned him about the crime. Present at this interrogation were the petitioner, Detective David Anderson of the Casper Police Department, and a Catholic priest, Father Velasquez, who was interpreting and explaining terminology to Mr. Ramos. (Trial Transcript, Vol. III, p. 450). After being told that the police were obtaining a warrant to search for the knife, the petitioner told the officer where the knife could be found. (Transcript, Vol. II, p. 354) After this admission, the petitioner invoked his right to counsel. Ramos, 806 P.2d at 827.
 
 
 29
 At trial, Detective Anderson testified that he did not end communications with the petitioner after assistance of counsel had been requested. Instead, without questioning the petitioner, the officer fulfilled his duty to inform the petitioner of the crime with which he would be charged. Wyo.R.Crim.P. 4(c)(3).[1] After the officer informed the petitioner that he was being charged with first degree murder and explained the concept of premeditation, the petitioner made what amounted to a full confession. At trial Detective Anderson described the exchange as follows:
 
 
 30
 Q. Did you explain to him then what he was charged with?
 
 A. Yes
 
 31
 Q. What did you tell him in that regard?
 
 
 32
 A. Told him he would be charged with first degree murder.
 
 
 33
 Q. Were you asking him any questions at this time?
 
 
 34
 A. No, I was telling him what was going on.
 
 
 35
 Q. Did you explain to him what that meant?
 
 
 36
 A. Father V[e]laquez was interpreting and explaining the terminology.
 
 
 37
 Q. What was told to him about what was meant?
 
 
 38
 A. That premeditated meant that he had time to think about what he was doing, and Mr. Ramos replied to that.
 
 
 39
 Q. What did Mr. Ramos reply, and in English or Spanish?
 
 
 40
 A. He spoke in English.
 
 
 41
 Q. What did he say?
 
 
 42
 A. He stated he had come out of the house, and he was going to fight Martin and that Martin hit him as he came out of the house, and that his hands were in his pockets, Mr. Ramos stated that his hand in his pocket came out of his pocket, and he had a knife in his hand, and he stabbed Martin by reflex.
 
 
 43
 Q. Did you ask him--excuse me.
 
 
 44
 A. And that Martin also struck him a second time, and I stopped him there.
 
 
 45
 Q. Did you ever ask him any questions during this time period?
 
 
 46
 A. No, I did not.
 
 
 47
 (Trial Transcript, Vol. III, p. 452-453)
 
 
 48
 In his petition, the petitioner argues that Detective Anderson wilfully ignored his request for counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. He also argues that the statements were admitted by the trial court in violation of his Fifth Amendment rights under Miranda v. Arizona, 440 U.S. 934 (1966).[2]
 
 
 49
 For a violation of right to counsel under Miranda and Edwards v. Arizona, 451 U.S. 477 (1981), the Court must find that Detective Anderson's explanation of the likely charges against the petitioner was such that the officer "should have known were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 302 (1980) (emphasis in original). In applying this rule the focus is on the perception of the suspect rather than the intent of the police. Id. at 301. If a statement is voluntary and not the result of interrogation, no violation of Miranda occurs. United States v. Porco, 842 F.Supp. 1393 (D.Wyo.1994).
 
 
 50
 In Miranda, the Supreme Court held that the assertion of the right to counsel is a significant event after which "the interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474. This rule was reinforced in Edwards v. Arizona, 451 U.S. 477, 484-485 (1981), where the Court held that a suspect
 
 
 51
 having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.
 
 
 52
 These rules were not followed in this case. Before the petitioner confessed, he had already implicated himself by disclosing the location of the murder weapon. As he was questioned, a Catholic priest was present and translating for the petitioner. These factors, as well as the stress and the late hour, combined to create an environment where the petitioner was likely to respond to Detective Anderson's accusation that he had premeditated the murder of Mr. Olivo.
 
 
 53
 Detective Anderson may have been performing his duty of telling the petitioner the charge for which he was being held; however, there is no reason this ministerial act could not have waited for the petitioner's counsel to arrive.
 
 
 54
 It is true that Detective Anderson was not actually asking questions of the petitioner, but that is not the standard under Innis. Telling a suspect in custody that he will be charged with premeditated murder qualifies as "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 302 (emphasis in original).
 
 
 55
 In Nelson v. Fulcomer, 911 F.2d 928 (3d Cir.1990), the Third Circuit held that Innis had been violated when a suspect invoked his right to remain silent and then was confronted by his accomplice. At the request of the police, the accomplice met with the petitioner and told him that he had made a full confession. Id. at 930. The Third Circuit concluded that this was a violation of the petitioner's right to remain silent and that the police's actions were likely to elicit an incriminating response in violation of Innis. Id. at 935.
 
 
 56
 In the instant case, the petitioner was in the company of a Catholic priest which made it more likely that he would confess. Additionally, the petitioner was informed that he was accused of planning the murder of Mr. Ramos. Such circumstances made it likely that Detective Anderson's comments would elicit an incriminating response. As a result, the petitioner's statement should have been suppressed as a violation of Miranda, supra, and Edwards, supra.
 
 
 57
 Having concluded it was error to admit this confession, the Court now must consider if the trial error was significant enough to require relief under Sec. 2254 or if it was harmless error. In deciding whether the error is harmless the relevant question is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, --- U.S. ----, 113 S.Ct. 1710, 1714 (1993). The Court concludes that it did not and was therefore harmless.
 
 
 58
 In Brecht, the United States Supreme Court announced that the Chapman v. California, 386 U.S. 18, 24 (1967) "harmless beyond a reasonable doubt" standard applicable to the direct review of federal convictions was not the standard for collateral review. Brecht, 113 S.Ct. at 1721-1722. Instead the Court adopted the standard found in Kotteakos v. United States, 328 U.S. 750 (1946), which focused on whether the constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 113 S.Ct. at 1722. Under the Kotteakos approach, habeas relief is not warranted unless a petitioner can establish that the trial error resulted in "actual prejudice." Id.[3]
 
 
 59
 The Supreme Court both announced and applied its new standard in Brecht and proceeded to assess the constitutional violation in light of the other evidence against the Mr. Brecht. Id. This Court follows the lead of the Supreme Court and turns to the evidence against the petitioner to weigh it against the violation of Miranda and Edwards.
 
 
 60
 A review of the trial transcript indicates that the eyewitness testimony against the petitioner was overwhelming. The first witness brought by the state was Mr. Raul Felix, a friend of the victim. (Transcript, Vol. I, p. 141.). Mr. Felix testified that he watched as the petitioner "attacked" Martine Olivo and that the victim backed up and tried to defend himself. (Transcript, Vol. I, pp. 150-151). According to Mr. Felix, the petitioner stabbed the victim Mr. Olivo three separate times, including once after the victim was already on the ground. (Transcript, Vol. II, pp. 152-153). The substance of this testimony showed that the petitioner aggressively attacked his victim and that he had no reason to fear for his safety.
 
 
 61
 The second witness called by the prosecution was Mr. Gerardo Acosta, who apparently had no significant relationship with either the petitioner or the victim. (Transcript, Vol. II, pp. 205-206, 208). Mr. Acosta testified that he saw the petitioner break free from those trying to hold him back and struggled with Mr. Olivo in the street. (Transcript, Vol. II, pp. 214, 216). Next, Mr. Acosta described how the petitioner stabbed Mr. Olivo first in the chest, then in the arm, and after Mr. Olivo had fallen to the ground, in the chest again. (Transcript, Vol. II, pp. 216-218). This testimony was substantially consistent with that of Mr. Felix.
 
 
 62
 The third witness brought by the prosecution was Mr. Gaudulaupe Vasquez, who had known the petitioner for a year and the victim for about three months. (Transcript Vol. II, p. 232-233). Like the prior witnesses, Mr. Vasquez testified that he saw the petitioner break free from individuals trying to restrain him and proceeded to charge the victim. (Transcript Vol. II, p. 237). Although Mr. Vasquez believed that Mr. Olivo also wanted to fight, he saw the victim grab his chest and say that he had been stabbed. (Transcript Vol. II, pp. 238-239). After the victim had been stabbed once and was trying to defend himself from the attack, Mr. Vasquez saw the petitioner "give him another two." (Transcript, Vol. II, p. 240).
 
 
 63
 The fourth witness called by the state was Mr. Ubaldo Flores, who apparently had known the petitioner for nine months and the victim for less than two months. (Transcript, Vol. II, pp. 251-252). Mr. Flores testified that he heard Mr. Olivo say that he didn't want to fight and saw him back away from the petitioner. (Transcript, Vol. II, p. 255). Then, as Mr. Flores got into his car he heard Mr. Olivo cry the he had been stabbed by the petitioner and Mr. Flores saw the petitioner continue to advance on the victim. (Transcript, Vol. II, p. 256).
 
 
 64
 Several witnesses later the state called Mr. Charas Loyzoya, who had known the petitioner for two years and the victim for two months before the crime. (Transcript, Vol. II, pp. 283-284). Mr. Loyzoya testified about his unsuccessful attempt to restrain the petitioner and prevent him from going outside the house to fight. (Transcript, Vol. II, pp. 292-293). Although Mr. Loyzoya didn't say that he saw the petitioner stab Mr. Olivo, he did see the petitioner hit him. (Transcript, Vol. II, p. 296). After the brief clash, Mr. Loyzoya saw the victim fall to the ground with blood on him. (Transcript, Vol. II, pp. 296, 297).
 
 
 65
 The next witness brought by the state was Ms. Lisa Quintana, who was the petitioner's live-in girlfriend at the time of the stabbing. (Transcript, Vol. II, pp. 301-302). Under direct examination, Ms. Quintana testified that on the night of the crime the petitioner had a small knife and was showing off how he could open and close it. (Transcript, Vol. II, p. 303). After the knife was admitted into evidence, Ms. Quintana was asked what she saw next. (Transcript, Vol. II, p. 308). She responded, "[w]as when I went outside with Devonn, and Martine was stabbed next." (Id.). Next Ms. Quintana related that she saw the victim lying on his stomach with blood on his abdomen. (Transcript, Vol. II, pp. 308-309).
 
 
 66
 After Ms. Quintana, the prosecution called Ms. Devonn Conn who lived at the same residence with the petitioner and Lisa Quintana. (Transcript, Vol. II, p. 314). Following a description of the party that night, Ms. Conn testified that she saw the petitioner argue with Mr. Olivo and the petitioner pushed her aside to get outside and fight with the victim. (Transcript, Vol. II, p. 324). Next, Ms. Conn recounted how she twice tackled the petitioner to prevent him from going outside and both times he escaped. (Transcript, Vol. II, pp. 325-326). According to Ms. Conn, once outside she confronted the petitioner once again, apparently after the brief fight had already taken place. (Transcript, Vol. II, pp. 327). Ms. Conn testified that she next went over to Mr. Olivo to help him. (Transcript, Vol. II, p. 328). Ms. Conn was asked how she knew Mr. Olivo was hurt and she responded, "I found warm blood all over me." (Id.)
 
 
 67
 This review of the state's evidence includes only the eye witnesses to the petitioner's crime. The testimony of seven witnesses, many of whom were friends of the petitioner, presents consistent and overwhelming evidence of his guilt. Among the witnesses who testified that the petitioner repeatedly broke free from those trying to restrain him were Mr. Acosta, Mr. Vasquez, Mr. Loyzoya, Ms. Quintana and Ms. Conn. Four witnesses, Mr. Felix, Mr. Acosta, Mr. Vasquez and Mr. Flores, all testified that they saw the petitioner stab the victim three times. This is a case where the state was not lacking for eyewitnesses or evidence. As a result it was not one where the admission of the petitioner's confession gave the state a crucial advantage necessary to prove its case.
 
 
 68
 In Brecht, the petitioner challenged the prosecution's use of his post-Miranda silence against him. Brecht, 113 S.Ct. at 1715. After concluding that the Kotteakos standard was applicable, the Supreme Court proceeded to apply it to Mr. Brecht's objection. Id. at 1722. While recognizing that the petitioner's Miranda rights had been violated, Chief Justice Rehnquist concluded that two pages of testimony out of a 900 page record was harmless error because it did not have "a substantial and injurious influence in determining the jury's verdict." Id.
 
 
 69
 Through the same analysis, this Court holds that the admission of the petitioner's confession in violation of Edwards did not have "a substantial and injurious influence in determining the jury's verdict." The prosecution introduced the confession through its last witness, after a procession of eyewitnesses had already provided strong evidence of the petitioner's guilt. The Court notes the strong similarity between the petitioner's challenge and that in Brecht. Also similar is the fact that the disputed evidence was a small part of the state's case. As a result the petitioner's conviction, like the one in Brecht, should stand.
 
 
 70
 II. The Trial Court's Failure to Hold a Pretrial Hearing:
 
 
 71
 The second issue the Court considers is the state trial court's failure to hold a pretrial hearing to determine the voluntariness of the petitioner's statements to the police. Such hearings are commonly known as "Jackson-Denno" hearings based on the United State Supreme Court's decision in Jackson v. Denno, 378 U.S. 368 (1964).[4] Before his trial, the petitioner filed a motion asking the court to determine the voluntariness of his confessions. Ramos, 806 P.2d at 828. The trial court declined to rule on this motion and instead ruled on the admissibility of these statements during the course of the trial. Id. When the petitioner raised this same issue before the Wyoming Supreme Court, that court held that the trial court erred, but, because the statements were admissible, the error was harmless. Ramos, 806 P.2d at 828-829. Like the Wyoming Supreme Court, this Court assumes that it was error not to hold a hearing outside the presence of the jury; however, the question is whether this error warrants relief. As discussed above, this Court applies the Brecht analysis to determine whether the trial court's error had a "substantial and injurious effect on the jury's verdict." Brecht, 113 S.Ct. at 1722.
 
 
 72
 This Court has already concluded that the admission of the petitioner's confession was error, but did not constitute reversible error. It therefore follows that if the admission of the challenged statement did not have a "substantial and injurious effect on the jury's verdict," the failure to hold a hearing on its admissibility can be no greater error. As a result, the trial court's failure to hold a Jackson-Denno hearing did not have a "substantial and injurious effect" on the verdict.
 
 
 73
 III. The Trial Court's Refusal to Give the Self-Defense Instruction:
 
 
 74
 The last issue properly before this Court is whether the trial court's refusal to give the petitioner's proffered self-defense instruction was a violation of his federal right to due process. Despite the respondents' contention that this Court cannot review this claim because the Wyoming Supreme Court's decision rested on state law, the petitioner raises federal due process concerns, which necessarily implicate the due process guarantee in the Fourteenth Amendment to the United States Constitution.[5] Therefore, the Court recognizes a cognizable federal question, namely, due process.
 
 
 75
 At the outset, the Court observes that the petitioner carries a heavy burden in his effort to overturn his conviction based on the omission of the self-defense instruction. In a habeas proceeding based on erroneous jury instructions, a state conviction can be overturned only when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. Shafer v. Stratton, 906 F.2d 506, 508 (10th Cir.), cert. denied, 498 U.S. 961 (1990). The Supreme Court has explained,
 
 
 76
 The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.
 
 
 77
 Henderson v. Kibbe, 431 U.S. 145, 154 (1977).
 
 
 78
 In the instant case, where an offered instruction was rejected by the trial court, the petitioner's burden is even higher still. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 155. Furthermore, the Fourth Circuit has held that the failure to give a self-defense instruction is not a violation of due process even where sufficient evidence to support it was presented at trial. Nickerson v. Lee, 971 F.2d 1125, 1138 (4th Cir.1992).
 
 
 79
 Despite the seemingly impossible burden on the petitioner, the Court recognizes that instruction error must be evaluated in the context of events at trial. United States v. Frady, 456 U.S. 152, 169 (1982). Therefore, the Court examines federal law and the record from the state trial court.
 
 
 80
 Under federal law, jury instructions must be supported by competent evidence to be delivered to the jury. Delo v. Lashley, --- U.S. ----, 113 S.Ct. 1222 (1993) and United States v. Haar, 931 F.2d 1368 (10th Cir.1991). In Delo, the Supreme Court considered a state trial court's refusal to instruct on mitigating evidence during the death penalty phase of a murder trial. Delo, 113 S.Ct. at 1223. Even in a capital punishment case, where the demand for due process is at its highest, the Supreme Court held: "[n]othing in the Constitution obligates state courts to give mitigating circumstances instructions when no evidence is offered to support them." Id. at 1225.
 
 
 81
 In Haar, the defendant appealed his federal conviction on drug charges, claiming, inter alia, that the trial court should have instructed on lesser included offenses. Haar, 931 F.2d at 1369. The Tenth Circuit first observed that "a trial judge is given substantial latitude and discretion in tailoring and formulating the instructions so long as they are correct statements of law and fairly and adequately cover the issues presented." Id. at 1371, ( quoting United States v. Pack, 773 F.2d 261, 267 (10th Cir.1985)). The court also noted "a defendant will not be entitled to an instruction which lacks 'reasonable legal and factual basis.' " Haar, 931 F.2d at 1371, (quoting United States v. Bryant, 892 F.2d 1446, 1468 (10th Cir.1989), cert. denied, 496 U.S. 939 (1990)). Thus, the Court examines if the Petitioner's theory of self-defense had a reasonable factual and legal basis.
 
 
 82
 As discussed above, the prosecution produced seven eye witnesses to the petitioner's crime. With little variation, all of these witness described how the petitioner broke away from those holding him back and viciously attacked Mr. Olivo. According to the testimony of almost all of the state's witnesses the victim did not pose a deadly threat to the petitioner. As the Wyoming Supreme Court noted, the only evidence supporting any theory of self-defense was the petitioner's own testimony. Ramos, 806 P.2d at 826. After reviewing the record this Court agrees. Thus, the Court evaluates the petitioner's testimony at trial to see if it provides sufficient evidence to support a self-defense instruction.
 
 
 83
 On direct examination, the petitioner testified that he wanted to talk to Mr. Olivo and he struggled away from those who were holding him back so he could get outside. (Transcript, Vol. III, p. 475). Next, according to the petitioner, he approached Mr. Olivo to speak with him when Mr. Olivo threw down his jacket and charged him. (Transcript, Vol. III, p. 467). Petitioner testified that when Mr. Olivo charged him he held out both of his hands to reach the petitioner's neck. (Id.) Petitioner testified that at this point he removed the knife, which was already locked in an open position, from his pocket and "poked" the victim. (Transcript, Vol. III, p. 476-477). Next, according to the petitioner's testimony, Mr. Olivo retreated, discovered he had been stabbed, and approached the petitioner once again, throwing punches. (Transcript, Vol. III, p. 477.) Petitioner contended that he wasn't thinking when he "poked" the victim the first time and the third time. (Transcript, Vol. III, p. 478-479).
 
 
 84
 After recounting how he fought and killed the victim, the petitioner went on to describe why he feared Mr. Olivo. Petitioner testified that Mr. Olivo had frequently tried to pick fights with him and usually carried a knife. (Transcript, Vol. III, p. 480). Petitioner asserted that he had the knife ready because he was afraid that Mr. Olivo or his friends would attack him and he didn't want to run because he "didn't want them to think that they would make me run from my house." (Transcript, Vol. III, p. 482-483). Also under direct examination, the petitioner stated that twenty seconds passed between the first time and the second time that he stabbed the victim. (Transcript, Vol. III, p. 485).
 
 
 85
 On cross-examination, the petitioner claimed that the third stab occurred when he held the knife out and Mr. Olivo ran into it. (Transcript, Vol. III, p. 496). Petitioner also admitted that during the course of the entire altercation Mr. Olivo never punched him because "I always waived it off with my free hand." (Transcript, Vol. III, p. 496).
 
 
 86
 Although there is no record of the jury instruction conference, the parties did make a record of their objections to the trial court's rulings on the instructions. (Transcript, Vol. III, p. 525). Defendant's counsel, Mr. James Raymond, objected to the court's failure to include Instruction No. E, which he describes as the "pattern jury self-defense instruction concerning elements of self-defense." (Transcript, Vol. III, p. 526). According to Mr. Raymond's statement, this instruction has two parts: (1) the defendant must be under a reasonable belief that he is about to be killed or injured; and (2) the defendant's belief must be objectively reasonable. (Id.). Based on the statements of both the prosecution and Mr. Raymond, the trial court apparently concluded that there was insufficient evidence to support a self-defense instruction and that such an instruction was inconsistent with the defense theory of recklessness. (Transcript, Vol. III, p. 527).
 
 
 87
 Considering the petitioner's testimony, the Court concludes that he has not demonstrated that the state trial court's failure to instruct on self-defense "by itself so infected the entire trial that the resulting conviction violates due process" as required by Cupp v. Naughten, 414 U.S. 141, 147 (1973). The Court also finds that the petitioner cannot meet the greater than plain error required by Henderson. There is simply a lack of evidence supporting the theory of self-defense and no evidence suggesting that the trial or its outcome was somehow "infected."
 
 
 88
 Based on the testimony at trial, on that fateful night in 1989, the petitioner was acting in an aggressive and provocative manner. Even if the petitioner was the only one telling the truth and Mr. Olivo did attack him and reach for his neck, that is insufficient to put him in fear of serious bodily injury or death. By the petitioner's own admission, Mr. Olivo never landed a punch on him. Furthermore, there was a crowd of people watching the fight--hardly the situation where someone will be choked to death.
 
 
 89
 Additionally, there were many ways the petitioner could have resolved or escaped from the conflict. Petitioner testified that as much as twenty seconds elapsed between the second and third stab. This was certainly time enough for him to retreat or escape--simply by walking the few steps to his home.
 
 
 90
 Without a reasonable factual basis supporting self-defense, the trial court did not error in refusing to instruct the jury on that theory. Haar, supra.
 
 Conclusion:
 
 91
 Following a review the record of the trial, the Court concludes that the trial court erred in admitting the petitioner's confession and by failing to hold a Jackson-Denno hearing to determine the admissibility of the statement prior to trial. After examining these errors in light of the whole record, the Court concludes the errors are harmless because they did not have a substantial and injurious effect in determining the jury's verdict. Finally, the Court finds that the trial court did not err in refusing to offer the petitioner's proposed self-defense instruction because that instruction was not supported by competent evidence. Therefore, It Is
 
 
 92
 ORDERED that the respondents' Motion to Dismiss the petitioner's Petition for Habeas Corpus be, and the same hereby is, GRANTED.
 
 
 93
 Dated this 9th day of February, 1995.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 Wyoming Rule of Criminal Procedure 4 provides, in part:
 Warrant or summons upon information.
 (c) Execution or service; return.
 (3) Manner.--The warrant shall be executed by the arrest of the defendant. The officer need not have the warrant in the officer's possession at the time of the arrest, but shall provide a copy of the warrant to the defendant as soon as possible. If the officer does not have the warrant in the officer's possession at the time of the arrest, the officer shall then inform the defendant of the offense charged and of the fact that a warrant has been issued.
 
 
 [2]
 Petitioner's Sixth and Fourteenth Amendment rights are not implicated because no formal adversarial proceedings had begun. See Massiah v. United States, 377 U.S. 201 (1964)
 
 
 [3]
 Such language in Brecht appears to assign the petitioner the burden proving that the error was prejudicial. Previously, the state had the burden of showing an absence of prejudice. See, Kotteakos, 328 U.S. at 760, and Chapman v. California, 386 U.S. 18, 24 (1967). This issue has not been resolved. The Tenth Circuit has reserved judgment and the United States Supreme Court has recently granted certiorari to resolve the issue. See, Hamons v. McKune, No. 93-3236, WL-594685, p. 7, n. 5 (10th Cir.1994), and O'Neal v. Morris, 62 U.S.L.W. 3680 (Apr. 12, 1994). Until it receives guidance from the Tenth Circuit or the Supreme Court, this Court will review the record independent of a burden on either party
 
 
 [4]
 Jackson-Denno hearings are held outside of the presence of a jury to determine the voluntariness of a defendant's statements to police before the statements are submitted to the jury. Jackson v. Denno, 378 U.S. 368, 378 (1964). Such a procedure is intended to prevent a jury's view of the voluntariness of a statement being infected by a view of the defendant's guilt. Id
 
 
 [5]
 Respondents argue that the Wyoming Supreme Court's decision on this issue rested on independent state grounds and, as a result, this Court should not review the issue under Coleman v. Thompson, 501 U.S. 722 (1991). However, the record shows that the petitioner has presented a federal question both to the Wyoming Supreme Court and this Court. In its opinion, the Wyoming Supreme Court stated that the second issue presented was "[w]hether the trial court's refusal to give defendant's requested self-defense instruction denied Appellant of his right to due process as guaranteed by the Wyoming and United States Constitutions." Ramos, 806 P.2d at 823. Despite the recognition of a federal question, the court relied exclusively on state law when it held against the Petitioner. Id. at 825-826. The Wyoming Supreme Court's decision to ignore the federal aspect of the petitioner's claim is not sufficient to create a procedural bar to the petitioner's claim in this Court. See, Order entered October 29, 1993, p. 11, n. 14. As authority for their contention that the petitioner's jury instruction claim is procedurally barred respondents cite, Herdon v. Georgia, 295 U.S. 441 (1935) and Fox Film Corp. v. Muller, 296 U.S. 207 (1935). However, both of these cases involve direct rather than collateral review and are inapplicable in the context of habeas corpus
 The right to habeas corpus review would be eviscerated if state courts could ignore properly presented federal claims by finding an independent state basis for ruling. As a result this Court concludes that the petitioner has properly presented a federal claim despite the fact the Wyoming Supreme Court disregarded this aspect of his claim.